# CIRCUIT COURT OF THE CITY OF ROANOKE

Billy Eugene Bishop

v.

Valley Rich Dairy et al.

July 28, 2003

Case No. CL01-1066

BY JUDGE CLIFFORD R. WECKSTEIN

Billy Eugene Bishop, who was severely injured in an accident at Valley Rich Dairy's Richlands, Virginia, branch, brought this damage suit against Valley Rich. I hold that, as Valley Rich argues, this suit must be dismissed because Valley Rich was Bishop's "statutory employer" under the Workers' Compensation Act.

In order to answer this "mixed question of law and fact," *Burch v. Hechinger Co.*, 264 Va. 165, 169, 563 S.E.2d 745 (2002), I heard testimony from Bishop and from three employees of Valley Rich. There are no material facts in dispute; the relevant facts are set forth in this opinion letter.

Valley Rich Dairy manufactures and distributes dairy products. At its "main dairy" in Roanoke, its employees load milk and other dairy products onto trailers that it leases from Ryder Integrated Logistics, Inc. Tractor-trailer drivers employed by Ryder then transport these products to Valley Rich branches and distribution centers in Virginia, West Virginia, and North Carolina. At these branches, Valley Rich employees transfer the products onto "route trucks" in which Valley Rich employees deliver the products to retail stores and restaurants. In November of 2000, when Bishop was injured, he was a tractor-trailer driver, employed by Ryder, transporting Valley Rich products.

Valley Rich had about a dozen branches and distribution centers. At all but two of these branches, Richlands and Marion, the Ryder driver unhooked (or "dropped") his trailer, which Valley Rich employees or delivery agents then unloaded, "hooked" another trailer onto his tractor, and returned to the Roanoke dairy.

In Richlands and Marion, the driver pulled up to a loading dock and unloaded the contents of his trailer. Testimony focused on the Richlands facility, where Bishop was injured. As the driver unloaded dairy products from his trailer, Valley Rich employees loaded those products onto their route trucks. Once the Ryder driver had unloaded the fresh dairy products that he was bringing from Roanoke, he put onto his trailer empty crates and spoiled or excess products that were to be returned to the Roanoke dairy. This "reloading" process was, in industry usage, considered a part of the process of "unloading" a trailer. (At the Valley Rich facilities other than Richlands and Marion, a Valley Rich employee loaded "empties" and "return product" onto a trailer that a Ryder driver eventually would "hook" and return to Roanoke.) When the Ryder driver finished putting empty crates and returned products onto his trailer in Richlands, he would haul that trailer to Rider's Bluefield, Virginia, plant, "drop" the trailer, and "hook" a different trailer, which he would then take back to Roanoke.

Bishop was injured on November 3, 2000. He had unloaded his trailer onto Valley Rich's Richlands loading dock, a stationary trailer; Valley Rich employees loaded onto their route trucks the products that Bishop had unloaded from his truck,[1] and Bishop was putting "empties" and returned products onto his trailer when he was hurt. Bishop transcript at 54.

The written contract between Ryder (as "carrier") and Valley Rich (as "shipper") is in evidence. Under the contract, Valley Rich agreed "to tender freight ('Product') to us [Ryder] for transportation, and we agreed to transport the product." Schedule B of the contract (poetically called "operations parameters") described the products to be transported, "Fresh Dairy Products." Schedule B also contained these relevant provisions:

> *Who loads in each instance?*  Shipper
> Loading Procedure: Driver shall perform a load count when picking up trailers (except for "dropped" trailers).

---

[1] Transcript of testimony of Howard Beckett, June 2, 2003, at 38; transcript of testimony of Billy E. Bishop, June 2, 2003, at 52-53.

*Who unloads in each instance?* Carrier
Unloading Procedure: ___ ... .
*Does Transportation include Returns?* X yes ___ no
If yes, of What? X rejected/extra Products X pallets ___
containers X empty milk racks
When/Where? As needed

The Workers' Compensation Act, Virginia Code §§ 65.2-100 *et seq.*, is intended to guarantee swift and certain compensation to workers who suffer accidental injury arising out of and in the course of their employment. The Act provides the exclusive remedy for those who come within its scope. Employees covered by the Act cannot maintain personal injury suits against their employers or have their damages determined by juries. However, they do not have to prove that employer negligence caused their injuries, as they would be required to do in traditional damage suits. Their right to compensation cannot be defeated by affirmative defenses, such as contributory negligence, that could be raised in personal injury suits. The rules of evidence are relaxed. Employers, though deprived of the right to demand proof of negligence and causation and the right to raise affirmative defenses, are free from suits brought by injured workers; the cost of workers' compensation coverage becomes a regular cost of doing business. *See Whalen v. Dean Steel Erection Co.*, 229 Va. 164, 171, 327 S.E.2d 102 (1985); *Feitig v. Chalkley*, 185 Va. 96, 97, 38 S.E.2d 73 (1946); Va. Code § 65.2-307.

The Act does not just bar covered workers from suing the company that writes their paychecks; it also precludes suits against "statutory employers." Va. Code § 65.2-302, entitled "Statutory employer," reads, in part:

A. When any person (referred to in this section as "owner") undertakes to perform or execute any work which is a part of his trade, business, or occupation and contracts with any other person (referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

Only an "other party," that is, someone who is neither an employer nor a statutory employer, can be sued for injuries suffered by a worker who is covered by the Act. *See Burch*, 264 Va. at 167-68. The determination of whether someone is a "statutory employer" or an "other party" depends on the particular facts of each case. *Id.* at 169.

Bishop was a "statutory employee" of Valley Rich at the time of his injury if he was performing work that was part of Valley Rich's "trade, business, or occupation" and doing so under the contract between Valley Rich and Ryder. *See Whalen*, 229 Va. at 171; *Shell Oil Co. v. Leftwich*, 212 Va. 715, 187 S.E.2d 162 (1972); *Burroughs v. Walmont*, 210 Va. 98, 168 S.E.2d 107 (1969).

There can be little question about the first part of this two-prong test. When Valley Rich's vice president of distribution was asked to "explain to the Court what Valley Rich does, what its business involves," he answered, "we are a dairy and we manufacture and distribute dairy products." Transcript of testimony of Robert W. Ives, June 2, 2003, at 8. This is Valley Rich's "trade" or "business." The vice president testified that dairy products are "volatile"; they have a "short life." It is critical to Valley Rich's business that those products be speedily and efficiently loaded onto trucks, transported to distribution centers, unloaded, and transferred to route trucks. *Id.* at 12. Every other stage of the process that culminates in delivery to the retail outlet or restaurant is performed by a Valley Rich employee. The intermediate step, transportation to, and unloading at, the distribution center, is as critical to the dairy's business as any other one in the process. *See Fowler v. Int'l Cleaning Serv., Inc.*, 260 Va. 421, 427-28, 537 S.E.2d 312 (2000) (the "combined efforts" of International, a janitorial company, and a Sears furniture store "were designed to accomplish Sears' goal of making its store clean, attractive, and safe, a goal necessary to the successful operation of Sears' furniture business. And, by its participation in those efforts, International was 'performing an essential part' of Sears' business." (Citation omitted.)); *Whalen*, 229 Va. at 171; *Stout v. Onorati*, 221 Va. 143, 147, 267 S.E.2d 154 (1980) ("Plaintiff's decedent had become involved in an essential part of Moose's business and was not merely performing an act which was tangentially related to Moose's other activities. . . ."). *Compare Hipp v. Sadler Materials Corp.*, 211 Va. 710, 711, 180 S.E.2d 501 (1971) (concrete truck driver performed the "final act of delivery not an act of construction constituting the trade, business, or occupation of the general contractor); *Burroughs*, 210 Va. 98, 100, 168 S.E.2d 107 (truck driver delivered sheetrock

358

to rooms in which building contractor's employees used it in construction. This "constituted the final act of delivery, not an act of construction. So [the driver's] activities did not transcend delivery, and he was not engaged in the trade, business, or occupation of [the contractor].")

To state the obvious, loading returned goods and empty milk crates onto trailers for return to the dairy in Roanoke was a part of Valley Rich's business of distributing dairy products. Simple common sense demonstrates that this is so, as does the fact that, at all the distribution centers excepts Richlands and Marion, the dairy company's own employees did these things. *See Shell Oil Co. v. Leftwich*, 212 Va. 715, 722, 187 S.E.2d 162 (1972); *Carmody v. F. W. Woolworth Co.*, 234 Va. 198, 205-06, 361 S.E.2d 128 (1987), *cf. Henderson v. Central Tel. Co.*, 233 Va. 377, 383, 355 S.E.2d 596 (1987) (The *Shell Oil Co.* test, though "merely an approach that is useful in determining an entity's trade, business, or occupation ... works best in cases involving private businesses ... [because] what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation."); *City of Winchester v. American Woodmark Corp.*, 252 Va. 98, 102, 471 S.E.2d 495 (1996) (a taxation case) ("Common sense compels the conclusion that these operations added value to American Woodmark's business product. . . .")

Bishop argues, however, that what he was doing when he was injured was not something that Ryder and therefore Bishop was obligated to do under the contract with Valley Rich. I do not agree.

Ryder contracted with Valley Rich to "transport" "fresh dairy products." By the explicit terms of the contract, Ryder's obligation of "transportation" "included" "returns" of "empty milk racks" and "rejected/extra Products." "In each instance," the contract obligated Ryder to unload the products it transported. According to the testimony, that obligation was discharged in full in Richlands and Marion. It was discharged by "dropping" at Valley Rich's other distribution centers. There is no indication in the evidence that either Ryder or Valley Rich complained about this difference.

When asked, "In your usage, and again, in your industry, is doing what you understand Mr. Bishop was doing on the day that he was injured loading or unloading," Valley Rich's vice president replied, "In our industry, that is part of unloading. It's reloading. I can maybe go a little further with that. We deliver some warehouses, grocery stores and we pay a driver unload charge. The driver unloads into a cooler, and he reloads the empties back in. That is the same scenario." Ives transcript, at 33. No evidence contradicts this characterization of the work Bishop was doing. *See Stout*, 221 Va. at 145 and

147; *Bosher v. Jamerson*, 207 Va. 539, 151 S.E.2d 375 (1966). The fact that loading returned goods and empty crates onto the trailers was Ryder's contractual obligation is demonstrated both by the plain language of the contract and by the uncontradicted testimony of Valley Rich's vice president.

"Whether a person or entity is a statutory employee is a jurisdictional matter presenting a mixed question of law and fact that must be resolved in light of the facts and circumstances of each case." *Fowler*, 260 Va. at 425 (citing *Cooke v. Skyline Swannanoa, Inc.*, 226 Va. 154, 156, 307 S.E.2d 246 (1983)). Under the facts and circumstances of this case, the court has concluded that Bishop's suit against Valley Rich is barred by the fact that he was Valley Rich's statutory employee.